**BURNHAM DOUGLASS**
Philip S. Burnham II, Esq. Attorney Id. No. 030951990
Michelle J. Douglass, Esq. Attorney Id. No. 025091988
450 Tilton Rd., Suite 200B
Northfield, NJ 08225
T: 856-751-5505 | F: 856-751-5516
E: pburnham@burnhamdouglass.com
E: mdouglass@burnhamdouglass.com
Attorneys for Plaintiffs, Lakeisha Davis & Kathryn Gannon

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | |
|---|---|
| **LAKEISHA DAVIS & KATHRYN GANNON**<br><br>Plaintiffs,<br><br>vs.<br><br>**CAPE MAY COUNTY PROSECUTOR'S OFFICE, THE COUNTY OF CAPE MAY; PAUL SKILL (in his official and individual capacity); and STEVE VIVARINA (in his official and individual capacity) (jointly and severally),**<br><br>Defendants. | Civil Action No.<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Lakeisha Davis, residing in Atlantic County, New Jersey, and Plaintiff, Kathyrn Gannon, residing in Cape May County, New Jersey, do hereby state against Defendants:

## TABLE OF CONTENTS

**JURISDICTION** **3**

**THE PARTIES AND OTHER INVOLVED INDIVIDUALS** **4**

**STATEMENT OF FACTS** **7**
    Facts Relating to Plaintiff, Lakeisha Davis 7
    Facts Relating to Plaintiff, Kathyrn Gannon 18

**LEGAL CLAIMS** **34**

**COUNT I** **34**
    Sex-Based Hostile Working Environment in Violation of Title VII to the Civil
    Rights Act of 1964, 42 U.S.C. §2000e et seq. 34
    (All Plaintiffs Against Defendant-County and Defendant-CMCPO) 34

**COUNT II** **36**
    Race-Based Hostile Working Environment in Violation of Title VII to the Civil
    Rights Act of 1964, 42 U.S.C. §2000e et seq. 36
    (Plaintiff-Davis Against Defendant-County and Defendant-CMCPO) 36

**COUNT III** **38**
    Retaliation in Violation of Title VII to the Civil Rights Act of 1964, 42
    U.S.C. §2000e et seq. 38
    (All Plaintiffs Against Defendant-County and Defendant-CMCPO) 38

**COUNT IV** **39**
    Race-Based Disparate Treatment in Violation of Title VII to the Civil
    Rights Act of 1964, 42 U.S.C. §2000e et seq. 39
    (Plaintiff-Davis Against Defendant-County and Defendant-CMCPO) 39

**COUNT V** **40**
    Gender-Based Disparate Treatment in Violation of Title VII to the Civil
    Rights Act of 1964, 42 U.S.C. §2000e et seq. 40
    (All Plaintiffs Against Defendant-County and Defendant-CMCPO) 40

**COUNT VI** **42**
    New Jersey Law Against Discrimination- 42
    Race-Based Hostile Working Environment in Violation of N.J.S.A. 10:5-1 et seq. 42
    (Plaintiff-Davis Against All Defendants) 42

**COUNT VII** **44**
    New Jersey Law Against Discrimination- 44

Gender-Based Hostile Working Environment in Violation of N.J.S.A. 10:5-1 et seq.   44
(All Plaintiffs Against All Defendants)   44

**COUNT VIII**   **45**
New Jersey Law Against Discrimination-   45
Retaliation in Violation of N.J.S.A. 10:5-1 et seq.   45
(All Plaintiffs Against All Defendants)   45

**COUNT IX**   **47**
New Jersey Law Against Discrimination-   47
Race-Based Disparate Treatment in Violation of N.J.S.A. 10:5-1 et seq.   47
(Plaintiff-Davis Against All Defendants)   47

**COUNT X**   **49**
New Jersey Law Against Discrimination-   49
Sex-Based Disparate Treatment in Violation of N.J.S.A. 10:5-1 et seq.   49
(All Plaintiffs Against All Defendants)   49

**COUNT XI**   **51**
New Jersey Law Against Discrimination-   51
Aiding and Abetting  in Violation of N.J.S.A. 10:5-1 et seq.   51
(All Plaintiffs Against All Defendants)   51

**PRAYER FOR RELIEF**   **52**

**DEMAND FOR JURY TRIAL**   **53**

**DESIGNATION OF TRIAL COUNSEL**   **53**

**NOTICE OF LITIGATION HOLD**   **53**

## JURISDICTION

1.  This Complaint presents federal claims arising under Title VII to the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* for which this Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and other applicable law.

2. This Court has supplemental jurisdiction for Plaintiffs' state law claims arising under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., pursuant to 28 U.S.C. §1367 and other applicable law.

3. This Court has personal jurisdiction pursuant to F.R.C.P. 4 and other applicable law over the Defendants, who are within this state and judicial district.

4. This Court is the appropriate venue pursuant to 42 U.S.C. §2000e-5(f)(3).  The unlawful employment practices were committed in this judicial district.

5. Plaintiffs did timely file charges with the Equal Employment Opportunity Commission ("EEOC"), and were issued their right to sue letters on December 09, 2021, this Complaint being filed within the time period set forth therein.  ***(See Exhibit "1," EEOC Right to Sue Letters).***

## THE PARTIES AND OTHER INVOLVED INDIVIDUALS

6. Plaintiff, Lakeisha Davis (hereafter "Plaintiff-Davis"), is a black female who is employed as a county detective with the Cape May County Prosecutor's Office and/or The County of Cape May.

7. Plaintiff-Davis is an "employee" of the Cape May County Prosecutor's Office and/or The County of Cape May within the meaning of  42 U.S.C. §2000e(f) and N.J.S.A §10:5-5.

8. Plaintiff, Kathryn Gannon (hereafter "Plaintiff-Gannon"), is a white female who is employed as a detective first class with the Cape May County Prosecutor's Office and/or The County of Cape May.

9. Plaintiff-Gannon is an "employee" of the Cape May County Prosecutor's Office and/or The County of Cape May within the meaning of  42 U.S.C. §2000e(f) and N.J.S.A §10:5-5.

10. Defendant, The County of Cape May (hereafter "the County" or "Defendant-County"), is a County government operating under The Cape May County Board of Commissioners. The commissioners are elected at large by the citizens of Cape May County and hold spaced 3-year terms.

11. Defendant-County employs the Cape May County Prosecutor and all persons employed within the Cape May County Prosecutor's Office such as the Chief of Detectives, detectives, and investigators, including the Plaintiffs.

12. Defendant-County has offices located at 4 Moore Road, Cape May Court House, NJ 08210, and is the "employer" of the Plaintiffs within the meaning of 42 U.S.C. §2000e(b) and N.J.S.A §10:5-5.

13. The Cape May County Prosecutor's Office ("CMCPO" or "Defendant-CMCPO") is a law enforcement agency with offices located at 4 Moore Road, Cape May Court House, NJ 08210, and is the "employer" of the Plaintiffs within the meaning of 42 U.S.C. §2000e(b) and N.J.S.A §10:5-5.

14. Defendant-CMCPO is a constitutionally created and established office and the Cape May County Prosecutor's functions and duties are established by statute. *See N.J.S.A.* 2A:158-1.

15. Defendant, Paul Skill ("Skill" or "Defendant-Skill") was, at times relevant to the Complaint, the Chief of County Detectives, an employee of the CMCPO and/or County, and a "supervisor" of Plaintiff-Davis and Plaintiff-Gannon.

16. Defendant-Skill is a "supervisor" of Plaintiffs within the meaning of the case law interpreting the New Jersey Law Against Discrimination, and thus is subject to aiding and abetting liability.

17. Defendant, Steve Vivarina ("Vivarina" or "Defendant-Vivarina") was, at times relevant to the Complaint, a Lieutenant, an employee of the CMCPO and/or County, and was a "supervisor" of Plaintiff-Davis and Plaintiff-Gannon.

18. Defendant-Vivarina is a "supervisor" of Plaintiffs within the meaning of the case law interpreting the New Jersey Law Against Discrimination, and thus is subject to aiding and abetting liability.

19. Mike Emmer ("Emmer") was, at times relevant to the Complaint, the Captain of County Detectives and an employee of the CMCPO and/or County.

20. Joseph Landis ("Landis") was, at times relevant to the Complaint, a Lieutenant, and an employee of the CMCPO and/or County,  and the "supervisor" of Plaintiff-Davis.

21. Dan Holt ("Holt") was, at times relevant to the Complaint, a Lieutenant, and an employee of the CMCPO and/or County.

22. Robert Harkins ("Harkins") was, at times relevant to the Complaint, a Sergeant, an employee of the CMCPO and/or County, and the "supervisor" of Plaintiff-Davis.

23. George Meyers ("Meyers") was, at times relevant to the Complaint, a Sergeant, an employee of the CMCPO and/or County, and the "supervisor" of Plaintiff-Gannon.

24. William Henfey ("Henfey") was, at times relevant to the Complaint, a Sergeant, an employee of the CMCPO and/or County,  and was a "supervisor" of Plaintiff-Gannon.

25. All the preceding and subsequently mentioned current and former employees of the CMCPO and/or the County were working within the course and scope of their employment, as agents, and/or on the basis of delegated authority of the CMCPO and/or County during times relevant to the Complaint.

## STATEMENT OF FACTS

### *Facts Relating to Plaintiff, Lakeisha Davis*

26. Plaintiff-Davis began working for Defendant-CMCPO in 2004 in an undercover grant-funded position in Narcotics.

27. Plaintiff-Davis was then hired in 2006 as a County Detective by Defendant-CMCPO, where she has served with distinction ever since.

28. Plaintiff-Davis has received satisfactory or above performance evaluations during all recent years of employment at the CMCPO.

29. In her most recent performance evaluation (year ending 2019), Plaintiff-Davis's supervisor commented that "Detective Davis is an asset to her Litigation Unit and her Trial Team, as evidenced by verbal compliments and accolades by co-workers and Assistant Prosecutor's whom she has directly assisted with case work and assistance in tasks," and that "Detective Davis has a positive outlook on life and a good work ethic that she puts towards each assignment."

30. Plaintiff-Davis has received many commendations, both formal and informal, for her work at the CMCPO including a recent formal commendation in March 2019 for going above and beyond the normal call of her duties.

31. Despite her above-average performance evaluations and many commendations, Plaintiff-Davis, as a black female, and as a direct result of her race and gender has suffered discrimination at the CMCPO.

32. Plaintiff-Davis has been denied opportunities and advancement due to her race and gender, and is experiencing a hostile working environment because she is a black female.

33. Plaintiff-Davis is the only black female detective at the CMCPO.

34. To her utter dismay, in or about September 2019, Plaintiff-Davis learned that she was called a "Nigger Bitch" by her supervisor, Defendant-Skill, a comment that has caused her to suffer from undue stress and anxiety, and has unraveled the very foundation of her career trajectory.

35. In September 2019, following the final denial of Plaintiff-Davis's attempt to volunteer through her church at the Cape May County Correctional Facility, she learned from at least two co-workers (one of which was present and heard first-hand) of an incident that occurred, off-duty, in a bar, called "The Country Club Tavern."

36. According to co-workers, then Sergeant Defendant-Skill became involved in a verbal argument with Kevin McLaughlin Sr., a then "Captain" of the Wildwood Police Department.

37. McLaughlin's son, Kevin McLaughlin Jr. is employed at the Cape May County Prosecutor's Office.

38. Defendant-Skill and McLaughlin Sr. had a conversation about Defendant-Skill's mistreatment of McLaughlin Jr.  This conversation turned into an argument when Defendant-Skill referred to Detective Davis as a "Nigger Bitch," along with other inappropriate derogatory comments.

39. McLaughlin Sr. took offense to Defendant-Skill's comments to the point it nearly ended in physical contact between the two.  This event took place in the presence of several co-workers and witnesses.

40. Wildwood Crest Police also discovered a Police report involving Dan Holt (a Lieutenant with Defendant-CMCPO and close friend of Defendant-Skill).

41. Holt was involved in a biased incident as a result of writing the word "Nigger" on a black girls' dorm room door while in college.

42. Being called a "Nigger Bitch" was not the first instance of discrimination that Plaintiff-Davis suffered at the CMCPO but it was the tipping point that led to her filing a charge with the EEOC in or about October 2019.

43. Plaintiff-Davis has suffered a continuous pattern of discrimination going back many years, which included unjust treatment because of her race and sex including, but not limited to: being denied overtime details, being given unjust discipline, being denied special teams, and this latest comment of being called a "Nigger Bitch" has caused her enormous emotional distress and anxiety.

44. Being called a "Nigger Bitch" by her supervisor and learning of the racism and bigotry of the leadership was the proverbial straw that broke the camel's back, and led to an outpouring of emotion.  It fatigued Plaintiff-Davis's typical positive outlook on life.

45. On October 31, 2019, Plaintiff-Davis did file an initial charge of discrimination with the EEOC alleging that "the culture of the Cape May County Prosecutor's Office is infused with bigotry, racism, and sexism," and that over the approximately five preceding years, she has suffered from an ongoing pattern of harassment and discrimination.

46. On December 13, 2019, Plaintiff-Davis did file a continuing charge of discrimination with the EEOC alleging many specific instances of discriminatory conduct.

47. This conduct included the promotion of many white males ahead of her, despite her superior experience and qualifications at the CMCPO.

48. Plaintiff-Davis requested assignment to the Hostage Negotiation team and was denied this assignment by Landis because she is a black female with, in the words of Landis, a "nasty attitude."

49. Office policy granted permission to employees living out of county and assigned to "special team details" (i.e., Rapid Response, SWAT, Hostage Negotiation and The ROBOT) to utilize their County issued vehicle.  The Office used the "special teams" guise to attract and give perks, such as the benefit of having a vehicle.

50. At the time there were nine employees who lived out of the county, one of which was literally a few blocks walking distance from Plaintiff-Davis's residence. Six out of the nine employees were granted take-home car permission, while Plaintiff-Davis and 2 others were not; one being ineligible due to not having call back duties or responsibility.

51. Previously, in 2015, Plaintiff-Davis expressed an interest in the Hostage Negotiation Team, in order to supplement her income by earning overtime and to benefit from not having to drive her personal car to work daily.  She documented her interest in a Memo to Captain Emmer however, she was not selected to the team nor was she given a response for her interest.

52. The Hostage Negotiation Team was, for times relevant, made up exclusively of male participants and, for many years, only white males.  As a black female, Plaintiff was excluded from this opportunity.

53. In 2018, Plaintiff-Davis once again expressed an interest in the Hostage Negotiation Team, which would have provided her with additional experience and supplemental income. She once again submitted a written memo of interest to Captain Emmer, who is a white male and friend of Defendant-Skill,  and to-date no response has been given.

54. Being assigned to the Hostage Negotiation team would have allowed Plaintiff-Davis to earn additional overtime compensation and benefit from the other perks granted to those involved.  At this time, there was an opening on the team, and training would have been provided to anyone who joined the team.

55. Back in or about 2012, Landis also said, within earshot of Plaintiff-Davis, that she was a "fucking bitch, who can't stay out of trouble."

56. Landis referred to Plaintiff-Davis as a "Bitch" multiple times in that conversation, which set the tone for later harassment and discrimination against Plaintiff-Davis.

57. In or about the years 2011-2015, Plaintiff-Davis was targeted and not protected as a black female. She reported to Defendant-Skill the continual verbal disrespect, disrespect of her ability, disrespect of her race and gender made during her assignments in Major Crimes and Special Victims.  Defendant-Skill responded that if Plaintiff-Davis was unhappy at work she could find another job "pumping gas."

58. Using the word "bitch" to refer to women was everyday talk amongst the males in the office then and now.

59. In or about  2015, due to Plaintiff-Davis's complaints of gender and race discrimination, she was disadvantageously transferred from the Special Victims Unit to the Litigation Unit which is in another building across town.

60. Within the CMCPO, being sent to the Litigation Unit is commonly known as the place you are sent as punishment or for a figurative "time out."

61. Plaintiff-Davis has been in Litigation ever since.

62. This disadvantageous transfer also led to a loss of status for Plaintiff-Davis within the CMCPO because the litigation unit is recognized as inferior and Plaintiff-Davis is part of a reputationally inferior unit which comes with a stigma.

63. Sometime between 2012-2015, Ashlee Hand-Marriner (a white female) reported gender and sexist disrespectful comments made by white males in the office, specifically Detective Tyler Parker, Detective Kevin McLaughlin, and Sergeant Bill Henfey.

64. Unlike reports made by Plaintiff-Davis, the white woman's report received attention and resulted in a suspension of the males involved in making the gender-based and sexist comments.

65. In or about June 2018, Plaintiff-Davis was assigned to a shredding detail in a garage that did not have air conditioning.  At the end of the shift, she changed out of her wet work shirt into a dry t-shirt.

66. With 1.5 hrs left in the work day, Plaintiff-Davis then went back to her office to begin switching desk locations in the office.  The short sleeved t-shirt exposed the butterfly tattoos on her arms.

67. Plaintiff's temporary exposure of her butterfly tattoos due to 100 degree weather sent Landis through the roof. The following day, Landis called a supervisor staff meeting expressing his dislike towards her "blatant" disrespect and disregard for the no exposure of tattoo policy.

68. It was 100 degree weather, and Plaintiff-Davis was working in a garage without air conditioning, and Landis used this as an excuse to berate her publicly because of her race and gender.

69. On August 30, 2021, Plaintiff-Davis was assigned to assist at a CMCPO Community Outreach Event, which was organized by Landis.

70. White male Detectives, Sergeants, and Lieutenants were also assigned and visibly displayed and exposed tattoo body art.

71. At this time, Plaintiff-Davis wore tattoo arm coverings as per Office Policy.   While Plaintiff-Davis was reprimanded for revealing her tattoo, these white males were publicly displaying their tattoos without similar reactions.

72. Ironically, Landis (white male), the same person who lambasted Plaintiff-Davis for exposing her tattoos, was exposing his tattoos (along with three other white males, Bill Henfey, Aaron Sykes, and Maurice Catarcio).

73. In or about May 2019, Lt. Landis surprisingly supported Plaintiff-Davis's initiative of ministering to the female inmate population at the Cape May County Correctional Facility.

74. However, by August 2019, shortly before learning that she was being called a "Nigger-Bitch" by Skill, Landis had changed his mind and ordered Plaintiff-Davis not to participate in Christian Outreach Ministries at the Cape May County Correctional Facility.

75. Plaintiff-Davis reported what transpired with Landis to Sergeant Harkins.

76. Harkins met with Landis to support her jail ministry program and even suggested that she was deserving of some type of written commendation for volunteering her own personal time to help change the Community.

77. Landis, who had repeatedly referred to Plaintiff-Davis as a "Bitch" is the Community Outreach Commander.  He did not want to commend Plaintiff-Davis for her community stewardship of the ministry program because she is a black female.

78. Defendant-Vivarina also denied Plaintiff-Davis the opportunity to earn overtime compensation by refusing her participation in ABC details because she is a black female. Defendant-Vivarina was overheard saying he "hates women in law enforcement."

79. Plaintiff-Davis reported to Defendant-Skill the mistreatment of Defendant-Vivarina and Landis, including the unequal treatment because she is a female, and Defendant-Skill did not take any action to investigate, and Plaintiff-Davis was told she could go work somewhere else.

80. Defendant-Skill, the same supervisor who referred to Plaintiff-Davis as a "Nigger Bitch," also told her to "go pump gas," implying that black women like her were not wanted as employees at the CMCPO.

81. Back in or about 2010-2011, Plaintiff-Davis overheard a conversation among white male co-workers, during which they said that she only got the job because Prosecutor Taylor needed a token black female to parade throughout the county.  Such comments were and continue to be an unfortunate reality in the CMCPO.

82. Plaintiff-Davis suffers emotional distress as a result of comments such as this.

83. The ongoing harassment and hostile working environment constitutes a continuing violation, and was substantially more than discrete acts, but rather consisted of a pattern of retaliatory animus, and significant and recurrent intimidation by her supervisors and coworkers over the course of many years.

84. Following Plaintiff-Davis's engaging in protected activities by filing charges of discrimination with the EEOC, Plaintiff-Davis suffered a series of adverse actions.

85. Plaintiff learned that the County had received her EEOC complaint in January 2020.

86. On or about January 2, 2020, Det. Zach DeWeese (white male) retaliated against Plaintiff-Gannon and Plaintiff-Davis by calling their EEOC filings baseless and meritless, in a retaliatory attempt to undermine their reputations at the Prosecutor's office.

87. On or about February 26, 2020, Captain Emmer and Lieutenant Marriner (white male/female) came to Plaintiff-Davis's office and asked to speak with her alone.

88. They told her they would be making personnel changes and wanted her to return to the Special Victims Unit.

89. However, if she returned, the white males who were discriminating against her would be given authority over her and/or access to her.

90. For fear of continuing retaliation and discrimination, she declined the transfer, and opted to stay in the Litigation Unit which is located in another building across the town despite that it is a less-prestigious assignment and viewed within the CMCPO as a "punishment assignment."

91. On or about June 18, 2020, while on duty, Plaintiff-Davis was driving into the parking area, and Defendant-Skill passed her in the car and waived his hand at Plaintiff-Davis awkwardly - in an odd childlike and taunting manner -  which was intimidating, and threatening to her.

92. On or about July 1, 2020, Plaintiff-Davis noticed that an email she had sent to Defendant-Skill relating to updates regarding the jail ministry program had been removed

from the email history.  She had personally reviewed the email only a couple days before, and it was there then, but somehow it had been removed.

93. Plaintiff-Davis contacted a source in High Tech who confirmed that Defendant-Skill had knowledge that the County server did not have the software or capacity to store deleted emails, therefore once deleted, it was gone forever.

94.  Plaintiff-Davis has reason to believe that Defendant-Skill through himself or his agents, removed and/or deleted the email.

95. On or about July 9, 2020, Plaintiff-Davis received information that the Internal Affairs Detectives of the Prosecutor's Office had been questioning inside and outside agency law enforcement officers regarding her recent Duty Weekend assignment.

96. Plaintiff-Davis had another officer cover her calls during that Duty Weekend when she was attending a Black Lives Matter event in Washington, DC on or around June 6, 2020.

97. Plaintiff-Davis was intimidated and threatened by learning that internal affairs was investigating her because someone else covered her shift assignment while she attended a Black Lives Matter event.

98. Covering other's shifts commonly occurs in the CMCPO.

99. The Internal Affairs Unit falls directly under the supervision of Defendant-Skill.

100.    On or about July 9, 2020, Plaintiff-Davis was advised by Lieutenant Landis that Sgt. Sykes wanted to meet with her as soon as possible, to retrieve a new cell phone.

101.    Upon arriving to get the cell phone, it is believed that Defendant-Skill was alerted of Plaintiff-Davis's presence. Within moments, Defendant-Skill was standing just outside the open door of Sgt. Sykes's Office. Defendant-Skill again acted to intimidate and

threaten Plaintiff-Davis by making no eye contact or direct conversation with Plaintiff-Davis.

102.   On or about July 14-15, 2020, after Plaintiff-Davis retrieved her new Office cell phone, she noticed that personal contacts from her personal Apple iPhone were now stored on the new Office Samsung Galaxy phone.

103.   Plaintiff-Davis did not sync her phones because she would not want Defendants to have access to her personal information.

104.   Thereafter, notes that Plaintiff-Davis was keeping regarding events, including discriminatory conduct, that specifically happened on certain dates, including August to December 2019, were gone from the Notes Application of her Apple iphone.

105.   On or about July 16, 2020, Plaintiff-Davis met with a tech-savvy friend, who noticed that some of her Apple notes were linked to the County email "Exchange' feature.

106.   Her friend removed the link from her phone but was unable to retrieve anything that was deleted.

107.   The next day, Plaintiff-Davis traveled to the Apple store in Marlton, with no success in retrieving the notes.

108.   On or about July 23, 2020, Plaintiff-Davis learned that an employee of Defendant-CMCPO was pressuring one of her witnesses for information about Plaintiff-Davis's charges of discrimination.

109.   The pressuring of witnesses is yet another alarming incident which reflects how Defendant-Skill is using his authority to intimidate and retaliate against Plaintiff-Davis for her filing charges of discrimination.

110.   During the week of July 27, 2020, Plaintiff-Davis received a call from Captain Emmer (who Skill had previously promoted to the rank of Captain), who advised that he was on speaker in the presence of Lt. Marriner.

111.   Emmer reported that he was contacted by the County Human Resources Department about Plaintiff-Davis's allegation of harassment.

112.   Captain Emmer asked if Plaintiff-Davis was willing to come into the Office to speak with him and Lt. Marriner about it.

113.   Emmer had no legitimate right or business in asking Plaintiff-Davis to meet with him and Marriner, when EEOC investigations are required to be kept confidential and investigated only through the proper channels.  This was an intimidation tactic and meant to silence her.

114.   Out of fear arising from the continued hostility and fear of further retaliation, Plaintiff-Davis declined the conversation.

115.   Due to the continuing retaliation against her, Plaintiff-Davis formally amended her EEOC complaint on or about December 2, 2020.

### *Facts Relating to Plaintiff, Kathyrn Gannon*

116.   Plaintiff-Gannon began working for Defendant-CMCPO in 2004 as a grant investigator, and, over the years worked a variety of positions including positions as a full-time detective, working in the Gangs, Guns & Narcotics Task Force, Major Crimes Unit, the Special Victims Unit, and most recently as a Detective First Class in the fugitive/warrants unit and as a Terminal Agency Coordinator ("TAC") Officer.

117.   Plaintiff-Gannon has worked at satisfactory and above average expectations for her entire tenure at the CMCPO.

118.    Among the many positive comments made about Gannon by her supervisors, are "Detective Gannon has shown high standards in her investigations.  Her cases are handled in a timely manner and well organized," and "Detective Gannon writes an excellent report and communicates well with the public and with outside law enforcement agencies."

119.    Regardless of Plaintiff-Gannon's repeatedly positive evaluations, she has been subject to discriminatory treatment due to her gender since she began working full time with the CMCPO.

120.    In or about fall of 2006, Plaintiff-Gannon was hired full-time at the CMCPS when she was pregnant, but she did not know that she was pregnant when she was told she would be hired full-time.

121.    Subsequently, her then-supervisor, Super, accused her of hiding the fact that she was pregnant during the hiring process.

122.     While she was pregnant, and at the same time that Super accused her of hiding her pregnancy, he threatened to terminate her, saying that it was not because she was pregnant, but was because she had moved her primary residence.

123.    The threats of termination caused Plaintiff undue stress during her pregnancy.  She scrambled to look for a new job while pregnant, because she was told she could possibly be terminated, and even interviewed with another office because of Super's threats.

124.     The real reason Super was threatening to terminate her was because she was a pregnant woman.

125.    In or about 2009, Plaintiff-Gannon and Defendant-Skill (who was at that time Plaintiff-Gannon's supervisory Lieutenant) left work to have a beer, which Plaintiff-Gannon believed would be a typical social event with a colleague.

126.    However, after arriving at the restaurant, Defendant-Skill turned around to visually scope out, in a very obvious way, Plaintiff-Gannon's buttocks.

127.    Plaintiff-Gannon immediately thought she had something on her jeans, and when she asked Defendant-Skill what he was looking at, he said "I just wanted to see what you were working with" and "I was just looking at your butt."

128.    Plaintiff-Gannon felt very uncomfortable being peered at by her supervisor, and finished her beer and left to go home.

129.    During October and November of 2014, Plaintiff-Gannon requested a title change and pay increase for the position of Detective First Class (DFC) and supplied a memorandum to Chief Kenneth Super noting her request and the reasons which made her eligible to be awarded the title change and salary increase.

130.    The position of DFC was awarded after the completion of ten (10) years in the office and as a result of past practices, had been awarded to all employees who had completed their ten (10) years within the office.

131.    However, there was a history of hesitancy to giving DFC positions to women in the office due to gender biases.

132.    After Plaintiff-Gannon submitted her memo, Chief Super requested to speak with Plaintiff-Gannon in his office and told her that Prosecutor Robert Taylor was going to "drag his feet" with putting her request through to the county and that he didn't believe it would be approved by Prosecutor Taylor and the County.

133.   Following this conversation, Plaintiff-Gannon was denied the title change to Detective First Class.

134.   Plaintiff-Gannon subsequently typed a memorandum stating she sought to file a grievance and supplied it to the PBA representative within her department, Detective Paul Worrell ("Worrell").

135.   Detective Worrell's response to reading her grievance was, "are you sure you wanna do this?" Worrell relayed that he would not recommend filing the grievance and that the PBA wouldn't represent Plaintiff-Gannon.

136.   Worrell's warning was foreshadowing the retaliation that Plaintiff-Gannon, as a woman in law enforcement, would continuously face for contesting the male dominated decisions of her superiors.

137.   Plaintiff-Gannon subsequently learned that she would receive the title change and the four (4) percent increase to the contractual step guides top salary.

138.   When Plaintiff-Gannon was provided paperwork to sign for the title change and pay increase, which was issued by Chief Super, it showed the top salary as being a lesser amount than what the actual top salary was in the contract.

139.   Plaintiff-Gannon then had to send the paperwork back to Chief Super and request a change to the salary amount.

140.   Chief Super did not like that Plaintiff-Gannon corrected him regarding the incorrect top salary.

141.   Chief Super and Prosecutor Taylor had underlying issues with Plaintiff-Gannon because she was a woman in law enforcement, and, as a result of this discrimination,

initially denied her request to become a Detective First Class and made her take several unnecessary steps to obtain the title of Detective First Class.

142.    Prior to Plaintiff-Gannon having to fight for her title change to Detective First Class, every single male Detective before her that reached his ten (10) year mark, had been awarded the title change to Detective First Class without hesitation.

143.    During the early months of 2015, at the retirement celebration for Chief Super, Super told Gannon that the reason she had not been promoted to date was because he "didn't like the way she acted or her behavior," which is simply a pretext for discrimination against her as a woman in law enforcement. Chief Super said she was too emotional and that was one of the reasons he prevented her from being promoted.

144.    Super still works at the Cape May County Prosecutor's Office and has daily influence on office politics.   He has regular meetings with Defendant-Skill which influences decisions within the CMCPO.

145.     On August 15, 2017, Cape May County Detectives were notified of a Sergeant's position becoming available in the near future.

146.    On August 31, 2017, Plaintiff-Gannon was interviewed for said position and ultimately denied the position of Sergeant, for which she was qualified.   Two (2) male detectives were given the position, at least one of which had lesser experience and training than Plaintiff-Gannon.

147.    In or about September 2017, a memorandum that Plaintiff-Gannon was ordered to write led to an internal affairs report and, as a result of filing this internal affairs report, the Professional Standards Unit conducted an investigation into certain actions of Defendant-Vivarina.

148.   Plaintiff-Gannon received an email on November 2, 2017, which included a notification letter dated October 31, 2017, which stated the Professional Standard Unit had conducted their investigation of Lt Viviarina and that "No colorable claim of criminal wrongdoing was established."

149.   Plaintiff-Gannon was left in the Major Crimes Unit under the supervision of Defendant-Vivarina after filing her internal affairs complaint against him, leaving her to be subjected to Defendant-Vivarina's resentment and retaliation for her actions.

150.   As a woman who was again standing up to a dominant male supervisor, she was subsequently retaliated against in a manner that no male counterpart would have been.

151.   During the months to come, Plaintiff-Gannon was informed that several members of the Cape May County Prosecutor's Office, including Defendant-Skill, claimed she filed the internal affairs complaint against Defendant-Vivarina not because of a reasonable belief of an illegal act, but out of spite for not being promoted.

152.   Those allegations were false and certainly would not have been made against a male in the office.

153.   Plaintiff-Gannon had to follow the instructions and requests of Lt. Marriner (female), who had, upon her suspicions, instructed Plaintiff-Gannon to file the internal affairs report.

154.   In October 2017, Plaintiff-Gannon was the lead detective conducting all the necessary duties for a case pertaining to terroristic threats.

155.   Plaintiff-Gannon handled the entire case pertaining to the terroristic threats, while a Detective Jack McDermott, male Detective and a personal friend of Defendant-Vivarina,

made a single phone call to a friend in another law enforcement department (in another State) in order to determine the suspect's location.

156.    Although he did nothing but make a phone call, Detective McDermott was awarded a positive performance notice/commendation on August 22, 2018.

157.    Lt. Vivarina told Sgt. Henfey to only give Detective McDermott the award, and not Plaintiff.

158.    This decision to exclude Plaintiff was motivated by Defendant-Vivarina's hatred of women in law enforcement.

159.    Plaintiff-Gannon did not receive a positive performance notice/commendation for her completed duties, even though she did all the work on this case.

160.    The failure to commend Plaintiff-Gannon was retaliation for discrimination against her as a woman in law enforcement.

161.    Plaintiff-Gannon reported the discrimination to Sergeant Henfey and asked why she had not received a positive performance notice/commendation for her work.

162.     Sergeant Henfey relayed that he did not agree with only giving Detective McDermott a positive notification; however, he was told to do so by Defendant-Vivarina.

163.    Defendant-Vivarina did not want to give Plaintiff-Gannon a positive performance notice and told Henfey to only write a positive performance commendation for Detective McDermott.

164.    Sgt. Henfey essentially agreed and/or complied with Defendant-Vivarina by not issuing a commendation to Plaintiff-Gannon, the lead detective on the case, however, Sgt. Henfey admitted it was wrong and/or discriminatory, yet Henfey took no action to investigate or correct the discrimination against her.

165. On or about January 29, 2018, Plaintiff-Gannon again reported the discrimination to Sergeant Henfey who acknowledged that he did see the way that Defendant-Vivarina was treating her and realized there was "tension."

166. However, Sergeant Henfey stated that there wasn't anything he could do because Defendant-Vivarina was his Lieutenant and outranked him.

167. Plaintiff-Gannon then explained to Sergeant Henfey that Defendant-Vivarina was putting him (Sgt. Henfey) in a compromising position as a ranking officer within the agency by not protecting/safeguarding his subordinates.

168. No investigation took place despite Plaintiff-Gannon's reports of discrimination, and there was no relaying of these reports up the chain of command.

169. Plaintiff, as the only female detective in the unit at the time, was ignored and the discrimination was permitted to continue.

170. In or about November 2017 and beyond, Defendant-Vivarina was being protected by his male counterparts, specifically Defendant-Skill.

171. On or about January 26, 2018, Defendant-Vivarina, as the Supervisor of Major Crimes, called Plaintiff-Gannon into his office for a closed door conversation.

172. During this conversation, Defendant-Vivarina did intentionally intimidate Plaintiff-Gannon by telling her that he was aware that Plaintiff-Gannon had previously initiated an internal affairs investigation against him.

173. As per the Internal Affairs Policy for the CMCPO, the principal (Defendant-Vivarina) of an investigation is never to address the allegations/report with the witness (Plaintiff-Gannon).

174.   As a result of this policy violation, Plaintiff-Gannon filed another Internal Affairs complaint against Defendant-Vivarina on January 26, 2018.

175.   Defendant-Vivarina continued to be protected from Plaintiff's reports of discrimination and other reports of unethical conduct by the male dominated culture at the CMCPO.

176.   A second internal affairs investigation was conducted into Defendant-Vivarina's actions as a result of Gannon's complaint.

177.   The investigation was conducted by two men who were extremely friendly with Defendant-Skill and Defendant-Vivarina, Captain Emmer and Lt. Holt.

178.   This is unusual because internal affairs investigations are typically handled by members of the Professional Standards Unit, and not friends of the accused.

179.   On April 18, 2018, Plaintiff-Gannon was notified by both Captain Emmer and Lt. Holt that this investigation was not substantiated because of insufficient evidence.

180.    Plaintiff-Gannon again felt helpless and invalidated, and believed that the male dominated administration was allowing Defendant-Vivarina to do as he pleased without any ramifications.

181.   Defendant-Vivarina continued to discriminate and retaliate against Plaintiff-Gannon by giving her unwanted cases and assigning her to cases to basically be the report writer or organizer of the case.  He treated her as a "detective secretary"  because she was a female, even though she was senior to many of her male counterparts.

182.   Defendant-Vivarina was continuously protected by the other men in the office.   He was allowed to retaliate against Plaintiff-Gannon for her reporting discrimination, and was insulated from any consequences for his actions.

183.    In January 2018, Plaintiff-Gannon noticed that someone within the agency had stolen her Police Benevolent Association (PBA) yearly issued cards (10-12) count, off of her desk.   She had reason to believe that Defendant-Vivarina had taken them.

184.    Plaintiff-Gannon made members of the Major Crimes Unit aware that her PBA cards were missing, to no avail.

185.    This was not the first thing that had gone missing from Plaintiff-Gannon's desk.  Prior to this, but never reported, included someone taking her training issued book, "Effective Phrases for Performance Evaluations."

186.    Plaintiff-Gannon has reason to believe that Defendant-Vivarina had taken her book. He had seen it, she had allowed him to look at it when he was her supervisor, and he had commented that he really liked it shortly before it had gone missing.

187.    Unfortunately, there aren't cameras monitoring Plaintiff-Gannon's desk, so the harassment in the form of taking things from her desk proceeded without remedy.

188.    In or about February 2018,  Defendant-Vivarina entered into the Major Crimes Unit and made a joke referencing male ejaculation ("cumming").

189.    The joke involved a vacuum salesman, with the punchline that, "he just keeps cumming."   This joke was told in front of members of the Major Crimes Unit and Plaintiff was the only woman present for this joke and did not laugh.

190.    Defendant-Vivarina told this joke to intentionally get under Plaintiff-Gannon's skin and to harass her, but she did not complain at that time because her prior reports of discrimination had gone unaddressed, and she feared even greater retaliation.

191.    Clearly, this was not the first instance that Plaintiff-Gannon was forced to endure such inappropriate jokes and comments.

192.    In her seventeen (17) years with the CMCPO, Plaintiff-Gannon had to endure the content of lewd conversations between males on many occasions including dirty jokes and comments regarding females inabilities, etc; however, Plaintiff-Gannon did not report these comments until recently for fear of reprisal and because any time she reported misconduct it went unaddressed in the male dominated CMCPO.

193.    Defendant-Vivarina continued as the supervisor of Plaintiff-Gannon.

194.    During this time, Plaintiff-Gannon was subjected to Lt. Viviarina's supervision and his attempts to inundate her with menial investigations, while her male counterparts were assigned minimal cases, and she was repeatedly subjected to Defendant-Vivarina's lack of acknowledgment and lack of respect for her ability to do her job because she was a woman in law enforcement.

195.    In or about May 2018, Captain Emmer and Defendant-Vivarina, in a closed door meeting, informed Plaintiff-Gannon that she would be assigned as a detective to the newly initiated "Animal Cruelty Task Force" and the Fugitive/Warrant Unit, and would be assuming the role of the TAC Officer, a position that was previously handled by a civilian agent.

196.    Plaintiff-Gannon was instructed to continue receiving Major Crimes Unit cases while attempting to learn the roles and duties of the Fugitive/Warrants Unit.

197.    Agent Loefflad, Plaintiff-Gannon's predecessor in the Fugitive/Warrants Unit was ending his employment with the office and was to train Plaintiff-Gannon, while she maintained a caseload in the Major Crimes Unit within a time frame of two to four weeks, with Plaintiff-Gannon attending a one week training during this timeframe.

198.   Plaintiff-Gannon felt undue stress because this duty-change was the male dominated administration's attempt to demean her as a woman by assigning her to a mostly clerical position, including data entry, filing, monitoring the system for misuse, and training employees - that requires no investigation responsibilities (which are regarded as more prestigious).

199.   This disadvantageous change of duty assignments led to a loss of status for Plaintiff-Gannon.

200.   As a detective, she was given the job of a civilian agent, and a detective being a higher position than a civilian agent, this change of duties was demeaning because these duties usually belonged to individuals of lower status and position than Plaintiff-Gannon. These menial tasks were assigned to Plaintiff-Gannon because she is a female.

201.   The TAC job was only ever held by agents, and not by a detective.

202.   Plaintiff-Gannon was overloaded with several responsibilities, more so than any other detective within the office because she was a woman in law enforcement.

203.   In or about February 2019, Sergeant Meyers told Plaintiff-Gannon that (at the demand of the Chief) she was not to wear her Police Benevolent Association (PBA) jacket in the office.

204.   In or about Summer 2019, Plaintiff-Gannon was informed that Defendant-Vivarina "hates women in law enforcement," and that he was overheard saying this to Plaintiff-Gannon's colleagues.

205.   In summer 2019, Viviarina said that he "hates females, specifically females in law enforcement."  Plaintiff-Gannon was a target of this assertion.

206.   On or about November 13, 2019, Plaintiff-Gannon filed an initial EEOC Charge of Discrimination Form, reporting that she was under the supervision of Defendant-Vivarina and was thereby suffering retaliation and harassment, and that she was retaliatorily transferred to a lesser position, which involved a significant loss of status.

207.   On December 18, 2019, Plaintiff-Gannon filed a charge of gender discrimination with the EEOC, alleging that the CMCPO's "male-dominated workplace has restricted my professional development to rise within the ranks; has hindered my potential earnings; has negatively influenced the perception my colleagues have of me and my work product; and, has prevented me from a leadership role."

208.   Plaintiff-Gannon has been denied opportunities and advancement due to her gender, and is experiencing a hostile working environment because she is a female.

209.   On or about January 2, 2020, Det. Zach DeWeese retaliated against Plaintiff-Gannon and Plaintiff-Davis by calling their EEOC filings baseless and meritless, in a retaliatory attempt to undermine their reputations at the CMCPO.

210.   On or about January 29, 2020, Plaintiff-Gannon saw former Chief, Ken Super in the hallway of the office and said "hello."

211.   Super completely ignored her, said nothing, and then walked behind her down the hallway in an intimidating manner.

212.   On February 5, 2020, Plaintiff-Gannon was called into Defendant-Skill's Office, with the presence of Captain Emmer and was told that she had to attend the "2020 Basic Internal Investigation School," from April 27, 2020 - May 1, 2020, at Rowan College (Sewell, NJ).

213.    On February 18, 2020, again in the presence of Captain Emmer, Defendant-Skill

assigned Plaintiff-Gannon to attend "DELTA School: Supervisor & Leadership Training,"

from March 23, 2020 - March 27, 2020, at Rowan College (Sewell, NJ)   and

unnecessarily stated that attending this school didn't mean she was going to be promoted.

214.    This mandated additional training was a direct result of Plaintiff-Gannon filing her

claim with the EEOC and Defendant-Skill's attempt to inundate her with classes/training

that would interfere with her ability to do her job.

215.    On February 19, 2020, Defendant-Skill advised Sergeant Meyers that he would like

Plaintiff-Gannon and Detective Neville to attend an "Advanced Animal Cruelty

Investigation Training" on April 9, 2020, at Stockton University.

216.    Some of the preceding courses were ultimately canceled as a result of COVID, but

the message to Plaintiff-Gannon was clear- in response to Plaintiff-Gannon filing an

EEOC complaint, the CMCPO is going to inundate her with menial work assignments

and overload her to interfere with her ability to do her job.

217.    On or about February 26, 2020, Plaintiff-Gannon was informed that Defendant-Skill

and Jeff Lindsay (human resources/legal counsel) knew about her charges of

discrimination but that Prosecutor Sutherland did not.

218.    Since Plaintiff-Gannon's employment with the CMCPO began, the CMCPO has only

ever had one (1) female promoted at a time within the ranks of the Detectives Section

(law enforcement section) of the office.

219.    Each was regarded as the "token" woman supervisor, and served at different times.

220.    Between June 15, 2020, and August 31, 2020, the Cape May County Prosecutor's

Office, in order to provide a safe work environment due to COVID-19, went to a split

shift schedule by operating on a split shift schedule designating an "A" and "B" working shift.

221.    Shift "A" was assigned to work 8:30 am - 12:00 pm and Shift "B" was assigned to work 1:00 pm - 4:30 pm.  Plaintiff-Gannon was assigned to Shift "A."

222.    Although there were split shifts, employees were to work from home during their opposite shifts.

223.    When submitting her internal time slip to request time off, Plaintiff-Gannon would submit for a total of eight (8) hours, which she was instructed to do by her supervisor, Sergeant George Meyers.

224.    Sergeant Meyers told Plaintiff-Gannon that he also submits eight (8) hours worth of time per day when he requests time off.

225.    These slips were then submitted to Captain Emmer, approved, and provided to the Office Manager, Sharon Gelsleichter.

226.    Subsequently, Sergeant Meyers informed Plaintiff-Gannon that Detective Gabe Berkey was submitting time slips for four (4) hours and not for eight (8) hours because Detective Berkey, who was assigned to Shift "B" claimed he was available during Shift "A" (AM) hours.

227.    After learning this information, Plaintiff-Gannon told Sergeant Meyers that she felt that it was wrong that she had to submit eight (8) hours while her male colleague was able to submit time for four (4) hours, and that she too is available during her work from home hours.

228.    Gannon stopped taking time off (during the split shift schedule) as a result of the discriminatory treatment.

229.    Through the fall and winter of 2020, Plaintiff-Gannon, as a direct result of her reports of gender discrimination, continued to be assigned menial tasks, overloaded with work, and not given the help she needed to effectively do her job.

230.    On March 22, 2021, Plaintiff-Gannon was brought into a meeting by Sergeant George Meyers and Captain Mike Emmer as a result of informing Sergeant Meyers that she was not available after 2 pm on one of her approved days off (March 17, 2021).

231.    When anyone in the office takes sick or vacation time, they are not required to answer calls, they are not on-call or subject to recall.

232.    Although Plaintiff-Gannon informed Meyers that she was not available during a certain time on a day off, she did ultimately talk to him on her day off and assisted him with his job duties.

233.    During the March 22, 2021 meeting, Sergeant Meyers told Plaintiff-Gannon that no matter what time is taken off (sick or vacation), she should always be available to take his calls and assist him with duties/functions within the fugitives/warrants unit.

234.    Sergeant Meyers accused Plaintiff-Gannon of being disrespectful.

235.    Captain Emmer relayed that instead of texting, that communication should be verbal. Emmer did not enforce the standard office practices - that employees should not be expected to work when out on approved sick or vacation time.

236.    As a female, Plaintiff-Gannon was singled out.  Meyers has never pulled his male counterparts into meetings to scold them for setting boundaries on talking to him on their approved days off.  He singled out Plaintiff-Gannon because she is a female.

237.    Plaintiff-Gannon's colleagues and supervisors (aside from Sergeant Meyers- who has to have interaction with Plaintiff-Gannon on a daily basis) continuously ignored her, and made it difficult for her to do her job and perform her job functions.

238.    Going into the present, and in retaliation for her reports of discrimination, Plaintiff has received minimal assistance (aside from the continued assistance from Agent Szczur) or response with accomplishing mandatory job functions, which she cannot complete without the cooperation of her supervisors and colleagues.

239.    The lack of assistance and the continued copious amount of duties/ assignments as well as the administrative work completed by Plaintiff-Gannon contributes to the continued retaliation for her reports of discrimination and is a result of gender discrimination and a gender-based hostile working environment.

240.    The ongoing harassment and hostile working environment constitutes a continuing violation, and was substantially more than discrete acts, but rather consisted of a pattern of retaliatory animus, and significant and recurrent intimidation by her supervisors and coworkers over the course of many years.

## LEGAL CLAIMS

## COUNT I

***Sex-Based Hostile Working Environment in Violation of Title VII to the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.***
***(All Plaintiffs Against Defendant-County and Defendant-CMCPO)***

241.    All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

242.    The Plaintiffs suffered intentional discrimination because of their sex.

243.    The discrimination was severe or pervasive.

244.    The discrimination detrimentally affected the Plaintiffs.

245.    The discrimination would detrimentally affect a reasonable person in like circumstances.

246.    There is the existence of respondeat superior liability and the Defendants had knowledge of the hostile working environment.

247.    Thus, Plaintiffs have made a *prima facie* case for a hostile working environment based on sex.  See *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017).

248.    The ongoing harassment and hostile working environment constitutes a continuing violation, and was substantially more than discrete acts, but rather consisted of a pattern of retaliatory animus, and significant and recurrent intimidation by her supervisors and coworkers over the course of many years.

249.    Plaintiffs have reported the hostile working environment, and Defendants have not taken reasonable measures to prevent or remediate the conduct, and the hostile environment has continued against them and caused them continuing harm.

**WHEREFORE,** Plaintiffs seek damages to vindicate Plaintiffs' rights under the laws and remedy the egregious loss and damages inflicted upon Plaintiffs by Defendants, including, but not necessarily limited to compensatory damages, emotional distress, bodily harm and injury, physical illness, economic damages, injunctive and equitable relief, every day and daily stress caused by Defendants illegal acts, punitive damages and any other damages the Court deems fair and just.

## COUNT II

***Race-Based Hostile Working Environment in Violation of Title VII to the Civil Rights Act of***

***1964, 42 U.S.C. §2000e et seq.***

**(Plaintiff-Davis Against Defendant-County and Defendant-CMCPO)**

250.   All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

251.   Plaintiff-Davis suffered intentional discrimination because of her race.

252.   The discrimination was severe or pervasive.

253.   The discrimination detrimentally affected Plaintiff-Davis.

254.   The discrimination would detrimentally affect a reasonable person in like circumstances.

255.   There is the existence of respondeat superior liability and the Defendants had knowledge of the hostile working environment.

256.   Thus, Plaintiff-Davis has made a *prima facie* case for a hostile working environment based on race.

257.   The use of the word "nigger" and similar racially epithets in the workplace is recurrently deemed to be intentional discrimination and severe unwelcome conduct.  See e.g. *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (holding the use of the word "nigger" as severe unwelcome conduct); *Bailey v. Binyon*, 583 F.Supp. 923, 927 (N.D. Ill. 1984) ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination per se"); *Tademy v. Union Pacific Corp.*, 520 F.3d 1149, 1162 (10th Cir. 2008) (unwelcome conduct determined based on evidence of offensive graffiti and cartoons and the word

"nigger" used); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("Far more than a mere offensive utterance, the word 'nigger' is pure anathema to African-Americans. Perhaps no single act can more quickly . . . create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger'") (internal quotation marks omitted); *Walker v. Thompson*, 214 F.3d 615, 619-22 (5th Cir. 2000) (racial epithets including "nigger" and "little black monkey" determined to be unwelcome conduct); *Ross v. Douglas County, Neb.*, 234 F.3d 391, 396-97 (8th Cir. 2000) (racial slurs are severe unwelcome conduct); and *Taylor v. Metzger*, 152 N.J. 490, 501 (1998) ("a single utterance of an epithet can, under particular circumstances, create a hostile work environment").

258.    The ongoing harassment and hostile working environment constitutes a continuing violation, and was substantially more than discrete acts, but rather consisted of a pattern of retaliatory animus, and significant and recurrent intimidation by her supervisors and coworkers over the course of many years.

259.    Plaintiff-Davis has reported the hostile working environment, and Defendants have not taken reasonable measures to prevent or remediate the conduct, and the hostile environment has continued against her and caused her continuing harm.

**WHEREFORE,** Plaintiff-Davis seeks damages to vindicate Plaintiff-Davis's rights under the laws and remedy the egregious loss and damages inflicted upon Plaintiff by Defendants, including, but not necessarily limited to compensatory damages, emotional distress, bodily harm and injury, physical illness, economic damages, injunctive and equitable relief, every day and daily stress caused by Defendants illegal acts, punitive damages and any other damages the Court deems fair and just.

## COUNT III

### *Retaliation in Violation of Title VII to the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.*

### *(All Plaintiffs Against Defendant-County and Defendant-CMCPO)*

260.   Plaintiffs engaged in protected activity by reporting the conduct and filing charges with the EEOC as set forth herein, by amending those charges in a timely manner to state additional retaliatory and discriminatory acts, and for other reports of gender and race discrimination, both internal and external, to Defendants.

261.   Defendants took adverse actions against Plaintiffs including, but not limited to,  the employee's loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, and toleration of harassment by other employees.

262.   There is a causal link between the protected activities and the employer's adverse actions.

263.   Any reason the employer proffers for the adverse actions against Plaintiffs shall be shown to be pretext for the real reason, that is retaliation and discrimination against Plaintiffs.

**WHEREFORE,** Plaintiffs seek damages to vindicate Plaintiffs' rights under the laws and remedy the egregious loss and damages inflicted upon Plaintiffs by Defendants, including, but not necessarily limited to compensatory damages, emotional distress, bodily harm and injury, physical illness, economic damages, injunctive and equitable relief, every day and daily stress caused by Defendants illegal acts, punitive damages and any other damages the Court deems fair and just.

## COUNT IV

***Race-Based Disparate Treatment in Violation of Title VII to the Civil Rights Act of 1964, 42***

***U.S.C. §2000e et seq.***

***(Plaintiff-Davis Against Defendant-County and Defendant-CMCPO)***

264.  All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

265.  Title VII to the Civil Rights Act of 1964 prohibits among other things, an employer from discriminating against employees on the basis of race.

266.  Plaintiff-Davis was, at all times relevant, an employee who could and did perform her job functions satisfactorily.

267.  Plaintiff-Davis is black.

268.  Defendants did subject Plaintiff-Davis to differential, worse, and intentionally discriminatory treatment based on her race, as set forth in the preceding paragraphs.

269.  The circumstances are such that there is an inference of unlawful discrimination.

270.  As a direct and proximate cause of Defendants' violations and adverse actions, Plaintiff-Davis has suffered damages because of it including, but not limited to: loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, toleration of harassment by other employees, reputational and financial loss, back pay, and front pay.

271.  Plaintiff-Davis has therefore made a prima facie case of disparate treatment discrimination.  See *Jones v. School Dist.*, 198 F.3d 403, 410-412 (3d Cir. 1999).

272.  The actions by Defendants also caused Plaintiff-Davis to suffer stress, unnecessarily so, which in turn caused and continues to cause anxiety, depression, sleeplessness, worry,

high blood pressure, exacerbation of intestinal illness, and loss of everyday enjoyment of life.

273.   Any reason proffered by Defendants for their disparate treatment of Plaintiff-Davis shall be shown to be pretext.

274.   The ongoing disparate treatment constitutes a continuing violation, and was substantially more than discrete acts, but rather consisted of a pattern of retaliatory animus, and significant and recurrent intimidation by supervisors over the course of many years, and this disparate treatment did occur and impact Plaintiff daily.

**WHEREFORE,** Plaintiff-Davis seeks damages to vindicate Plaintiff-Davis's rights under the laws and remedy the egregious loss and damages inflicted upon Plaintiff by Defendants, including, but not necessarily limited to compensatory damages, emotional distress, bodily harm and injury, physical illness, economic damages, injunctive and equitable relief, every day and daily stress caused by Defendants illegal acts, punitive damages and any other damages the Court deems fair and just.

## COUNT V

### *Gender-Based Disparate Treatment in Violation of Title VII to the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.*

### *(All Plaintiffs Against Defendant-County and Defendant-CMCPO)*

275.   All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

276.   Title VII to the Civil Rights Act of 1964 prohibits among other things, an employer from discriminating against employees on the basis of gender.

277.     Plaintiffs were, at all times relevant, employees who could and did perform their job functions satisfactorily.

278.     Plaintiffs are female.

279.     Defendants did subject Plaintiffs to differential, worse, and intentionally discriminatory treatment based on their gender, as set forth in the preceding paragraphs.

280.     The circumstances are such that there is an inference of unlawful discrimination.

281.     As a direct and proximate cause of Defendants' violations and adverse actions, Plaintiffs have suffered damages because of it including, but not limited to: loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, toleration of harassment by other employees,  reputational and financial loss, back pay, and front pay.

282.     Plaintiffs have therefore made a prima facie case of disparate treatment discrimination.  See *Jones v. School Dist*., 198 F.3d 403, 410-412 (3d Cir. 1999).

283.     The actions by Defendants also caused Plaintiffs to suffer stress, unnecessarily so, which in turn caused and continues to cause anxiety, depression, sleeplessness, worry, high blood pressure, exacerbation of intestinal illness, and loss of everyday enjoyment of life.

284.     Any reason proffered by Defendants for their disparate treatment of Plaintiffs shall be shown to be pretext.

285.     The ongoing disparate treatment constitutes a continuing violation, and was substantially more than discrete acts, but rather consisted of a pattern of retaliatory animus, and significant and recurrent intimidation by supervisors over the course of many years, and this disparate treatment did occur and impact Plaintiffs daily.

**WHEREFORE,** Plaintiffs seek damages to vindicate Plaintiffs' rights under the laws and remedy the egregious loss and damages inflicted upon Plaintiffs by Defendants, including, but not necessarily limited to compensatory damages, emotional distress, bodily harm and injury, physical illness, economic damages, injunctive and equitable relief, every day and daily stress caused by Defendants illegal acts, punitive damages and any other damages the Court deems fair and just.

## COUNT VI

### *New Jersey Law Against Discrimination-*

### *Race-Based Hostile Working Environment in Violation of N.J.S.A. 10:5-1 et seq.*

### *(Plaintiff-Davis Against All Defendants)*

286.   All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

287.   Plaintiff-Davis is black.

288.   Defendants are "employers," "supervisors," and "persons" under the definitions contained within the LAD.

289.   Plaintiff-Davis is an "employee" of Defendants within the definition contained within the LAD.

290.   Plaintiff-Davis has suffered from conduct that occurred because of her race.

291.   A reasonable person would consider such conduct sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment.

292.   Plaintiff-Davis reported the conduct.

293.   The Defendants did not investigate the conduct or take any prompt or reasonable steps to remediate the conduct.

294.   Plaintiff-Davis has continued to suffer from the hostile environment, and has suffered damages because of it including, but not limited to: loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, toleration of harassment by other employees, reputational and financial loss, back pay, and front pay.

295.   As a result of this conduct, Plaintiff-Davis has suffered stress, unnecessarily so, which in turn caused and continues to cause anxiety, depression, sleeplessness, worry, high blood pressure, exacerbation of intestinal illness, and loss of everyday enjoyment of life.

296.   The ongoing harassment and hostile working environment constitutes a continuing violation, and was substantially more than discrete acts, but rather consisted of a pattern of retaliatory animus, and significant and recurrent intimidation by her supervisors and coworkers over the course of many years.

**WHEREFORE,** Plaintiff-Davis seeks damages to vindicate Plaintiff-Davis's rights under the laws and remedy the egregious loss and damages inflicted upon Plaintiff by Defendants, including, but not necessarily limited to compensatory damages, emotional distress, bodily harm and injury, physical illness, economic damages, injunctive and equitable relief, every day and daily stress caused by Defendants illegal acts, punitive damages and any other damages the Court deems fair and just.

## COUNT VII

### New Jersey Law Against Discrimination-

### Gender-Based Hostile Working Environment in Violation of N.J.S.A. 10:5-1 et seq.

### (All Plaintiffs Against All Defendants)

297.   All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

298.   Plaintiffs are female.

299.   Defendants are "employers," "supervisors," and "persons" under the definitions contained within the LAD.

300.   Plaintiffs are each an "employee" of Defendants within the definition contained within the LAD.

301.   Plaintiffs have suffered from conduct that occurred because of their sex.

302.   A reasonable woman and person would consider such conduct sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment.

303.   Plaintiffs reported the conduct.

304.   The Defendants did not investigate the conduct or take any prompt or reasonable steps to remediate the conduct.

305.   Plaintiffs have continued to suffer from the hostile environment, and have suffered damages because of it including, but not limited to: loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, toleration of harassment by other employees, reputational and financial loss, back pay, and front pay.

306.    As a result of this conduct, Plaintiffs have suffered stress, unnecessarily so, which in turn caused and continues to cause anxiety, depression, sleeplessness, worry, high blood pressure, exacerbation of intestinal illness, and loss of everyday enjoyment of life.

307.    The ongoing harassment and hostile working environment constitutes a continuing violation, and was substantially more than discrete acts, but rather consisted of a pattern of retaliatory animus, and significant and recurrent intimidation by their supervisors and coworkers over the course of many years.

**WHEREFORE,** Plaintiffs seek damages to vindicate Plaintiffs' rights under the laws and remedy the egregious loss and damages inflicted upon Plaintiffs by Defendants, including, but not necessarily limited to compensatory damages, emotional distress, bodily harm and injury, physical illness, economic damages, injunctive and equitable relief, every day and daily stress caused by Defendants illegal acts, punitive damages and any other damages the Court deems fair and just.

## COUNT VIII

### *New Jersey Law Against Discrimination-*

### *Retaliation in Violation of N.J.S.A. 10:5-1 et seq.*

### *(All Plaintiffs Against All Defendants)*

308.    All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

309.    The LAD makes it illegal "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act..." *N.J.S.A.* 10:5-12(d).

310.    Defendants are "employers," "supervisors," and "persons" under the definitions contained within the LAD.

311.    Plaintiffs are female and employees of Defendants, and Plaintiff-Davis is a black female, and they were subjected to harassment, discrimination, and a hostile working environment.

312.    Plaintiffs engaged in protected activity known to the employer-Defendants, by reporting harassment, gender discrimination, and a gender-based hostile working environment.

313.    Plaintiffs were subjected to adverse employment decisions and actions including, but not limited to: loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, and/or toleration of harassment by other employees.

314.    Plaintiffs engagement in protected activity did cause, both directly and proximately, the adverse employment actions against them, and thereby reputational and financial loss, back pay, and front pay.

315.    Many of Defendants' retaliatory acts against Plaintiffs took place within two years prior to the filing of this Complaint, and thus are not barred by the statute of limitations.

316.    Plaintiffs' protected activity was both reasonable and made in good faith.

317.    Any proffered reason for these adverse employment actions against Plaintiffs shall be shown to be pretext.

**WHEREFORE,** Plaintiffs seek damages to vindicate Plaintiffs' rights under the laws and remedy the egregious loss and damages inflicted upon Plaintiffs by Defendants, including, but not necessarily limited to compensatory damages, emotional distress, bodily harm and injury,

physical illness, economic damages, injunctive and equitable relief, every day and daily stress caused by Defendants illegal acts, punitive damages and any other damages the Court deems fair and just.

## COUNT IX

### *New Jersey Law Against Discrimination-*

### *Race-Based Disparate Treatment in Violation of N.J.S.A. 10:5-1 et seq.*

### *(Plaintiff-Davis Against All Defendants)*

318.    All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

319.    The LAD, at *N.J.S.A.* 10:5-12(a), prohibits among other things, an employer from discriminating against employees on the basis of race.

320.    Defendants are "employers," "supervisors," and "persons" under the definitions contained within the LAD.

321.    Plaintiffs-Davis is an "employee" of Defendants within the definition contained within the LAD.

322.    Plaintiff-Davis was, at all times relevant, an employee who could and did perform her job functions satisfactorily.

323.    Plaintiff-Davis is black.

324.    *N.J.S.A.* 10:5-4 prohibits discrimination in the workplace and states: "All persons shall have the opportunity to obtain employment … without discrimination because of … race … subject only to conditions and limitations applicable alike to all persons.  This opportunity is recognized as and declared to be a civil right."

325.    Defendants did subject Plaintiff-Davis to differential, worse, and intentionally discriminatory treatment based on her race, as set forth in the preceding paragraphs.

326.    As a direct and proximate cause of Defendants' LAD violations and adverse actions, Plaintiff-Davis has suffered damages because of it including, but not limited to: loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, toleration of harassment by other employees, reputational and financial loss, back pay, and front pay.

327.    The actions by Defendants also caused Plaintiff-Davis to suffer stress, unnecessarily so, which in turn caused and continues to cause anxiety, depression, sleeplessness, worry, high blood pressure, exacerbation of intestinal illness, and loss of everyday enjoyment of life.

328.    Any reason proffered by Defendants for their disparate treatment of Plaintiff-Davis shall be shown to be pretext.

329.    The ongoing disparate treatment constitutes a continuing violation, and was substantially more than discrete acts, but rather consisted of a pattern of retaliatory animus, and significant and recurrent intimidation by supervisors over the course of many years, and this disparate treatment did occur and impact Plaintiff daily.

**WHEREFORE,** Plaintiff-Davis seeks damages to vindicate Plaintiff-Davis's rights under the laws and remedy the egregious loss and damages inflicted upon Plaintiff by Defendants, including, but not necessarily limited to compensatory damages, emotional distress, bodily harm and injury, physical illness, economic damages, injunctive and equitable relief, every day and daily stress caused by Defendants illegal acts, punitive damages and any other damages the Court deems fair and just.

## COUNT X

### New Jersey Law Against Discrimination-

### Sex-Based Disparate Treatment in Violation of N.J.S.A. 10:5-1 et seq.

### (All Plaintiffs Against All Defendants)

330.   All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

331.   The LAD, at *N.J.S.A.* 10:5-12(a), prohibits among other things, an employer from discriminating against employees on the basis of gender.

332.   Defendants are "employers," "supervisors," and "persons" under the definitions contained within the LAD.

333.   Plaintiffs are each an "employee" of Defendants within the definition contained within the LAD.

334.   Plaintiffs were, at all times relevant, employees who could and did perform their job functions satisfactorily.

335.   Plaintiffs are female.

336.   *N.J.S.A.* 10:5-4 prohibits discrimination in the workplace and states: "All persons shall have the opportunity to obtain employment … without discrimination because of … sex … subject only to conditions and limitations applicable alike to all persons.  This opportunity is recognized as and declared to be a civil right."

337.   Defendants did subject Plaintiffs to differential, worse, and intentionally discriminatory treatment based on their gender, as set forth in the preceding paragraphs.

338.   As a direct and proximate cause of Defendants' LAD violations and adverse actions, Plaintiffs have suffered damages because of it including, but not limited to: loss of status,

a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, toleration of harassment by other employees, reputational and financial loss, back pay, and front pay.

339.    The actions by Defendants also caused Plaintiffs to suffer stress, unnecessarily so, which in turn caused and continues to cause anxiety, depression, sleeplessness, worry, high blood pressure, exacerbation of intestinal illness, and loss of everyday enjoyment of life.

340.    Any reason proffered by Defendants for their disparate treatment of Plaintiffs shall be shown to be pretext.

341.    The ongoing disparate treatment constitutes a continuing violation, and was substantially more than discrete acts, but rather consisted of a pattern of retaliatory animus, and significant and recurrent intimidation by supervisors over the course of many years, and this disparate treatment did occur and impact Plaintiffs daily.

**WHEREFORE,** Plaintiffs seek damages to vindicate Plaintiffs' rights under the laws and remedy the egregious loss and damages inflicted upon Plaintiffs by Defendants, including, but not necessarily limited to compensatory damages, emotional distress, bodily harm and injury, physical illness, economic damages, injunctive and equitable relief, every day and daily stress caused by Defendants illegal acts, punitive damages and any other damages the Court deems fair and just.

## COUNT XI

### *New Jersey Law Against Discrimination-*

### *Aiding and Abetting  in Violation of N.J.S.A. 10:5-1 et seq.*

### *(All Plaintiffs Against All Defendants)*

342.    All of the foregoing and subsequent paragraphs are incorporated herein by this reference as if stated here in their entirety.

343.    The LAD, *N.J.S.A.* 10:5-12(e) makes it illegal for any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so.

344.    The Defendants aided each other with performing wrongful acts that did cause injuries to Plaintiffs.

345.    The Defendants were aware of their role as part of the overall illegal activity at the time each provided the assistance to the other.

346.    The Defendants knowingly and substantially assisted each other in the principal violations of the Law Against Discrimination.

347.    As a direct and proximate cause of Defendants' LAD violations, including aiding and abetting each other,  Plaintiffs have suffered damages because of it including, but not limited to: loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, toleration of harassment by other employees, reputational and financial loss, back pay, and front pay.

348.    The actions by Defendants also caused Plaintiffs to suffer stress, unnecessarily so, which in turn caused and continues to cause anxiety, depression, sleeplessness, worry,

high blood pressure, exacerbation of intestinal illness, and loss of everyday enjoyment of life.

**WHEREFORE,** Plaintiffs seek damages to vindicate Plaintiffs' rights under the laws and remedy the egregious loss and damages inflicted upon Plaintiffs by Defendants, including, but not necessarily limited to compensatory damages, emotional distress, bodily harm and injury, physical illness, economic damages, injunctive and equitable relief, every day and daily stress caused by Defendants illegal acts, punitive damages and any other damages the Court deems fair and just.

## **PRAYER FOR RELIEF**

**WHEREFORE**, these premises considered, Plaintiffs request this court enter judgment in their favor on all counts and specifically:

1. Award Plaintiffs compensatory damages for all monetary and financial losses, including (but not limited to): past and future loss of income and benefits of employment, lost career and business opportunities and advancement, and other past and future pecuniary losses in an amount to be determined by an enlightened jury;

2. Award Plaintiffs compensatory damages for non-pecuniary injuries including (but not limited to): emotional stress, anxiety, shame, embarrassment, humiliation, powerlessness, and indignity, in an amount to be determined by an enlightened jury;

3. Award Plaintiffs exemplary and punitive damages in an amount to be determined by an enlightened jury;

4. Award Plaintiffs reasonable attorneys' fees and costs of this action, including expert fees, and other fees and costs permitted by law;

5. Award Plaintiffs other monetary damages to which they may be entitled to under law;

6. Award Plaintiffs appropriate pre-judgment and post-judgment interest; and

7. Award Plaintiffs such other relief, including equitable relief and costs, as may be appropriate, fair, and just.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a trial by jury on all of the triable issues of this complaint.

## DESIGNATION OF TRIAL COUNSEL

Michelle J. Douglass, Esq., and Philip S. Burnham, II, Esq. are hereby designated as trial counsel in the above-captioned matter.

## NOTICE OF LITIGATION HOLD

The parties are hereby required to preserve documents that may be relevant to the issues to be raised, and their failure to do so may result in a finding of spoliation of evidence. The obligation to preserve evidence begins when a party knows or should have known that the evidence is relevant to future or current litigation. You are on notice of litigation and therefore have an obligation to suspend your routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." At a minimum, that means that you or counsel on your behalf must direct you and all of your agents, employees, and

representatives in this matter to ensure that documents and video and/or audio recordings be preserved, not deleted from an electronically stored information system or otherwise destroyed or made unavailable. Failure to do so has been found to be 'grossly negligent' and may subject you to punishment.

Respectfully submitted,

**BURNHAM DOUGLASS**
Attorneys for Plaintiffs, Lakeisha Davis and Kathryn Gannon

*s/ **Michelle J. Douglass***
Michelle J. Douglass, Esq.

*s/ **Philip S. Burnham, II***
Philip S. Burnham, II, Esq.

Date: February 14, 2022

# EXHIBIT 1

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

December 09, 2021

Ms. Lakeisha G. Davis
c/o Michelle J. Douglass, Esquire
Law Offices of Burnham & Douglass
8000 Sagemore Drive
Suite 8303
Marlton, NJ  08053

Re:  EEOC Charge Against Cape May County Prosecutor's Office
    No. 530201906296

Dear Ms. Davis:

    Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

    If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

    The investigative file pertaining to your case is located in the EEOC Philadelphia District Office, Philadelphia, PA.

    This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                Sincerely,

                Kristen Clarke
                Assistant Attorney General
                Civil Rights Division

        by       /s/ Karen L. Ferguson
                Karen L. Ferguson
                Supervisory Civil Rights Analyst
                Employment Litigation Section

cc: Philadelphia District Office, EEOC
   Cape May County Prosecutor's Office

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

December 09, 2021

Ms. Kathryn M. Gannon
c/o Michelle J. Douglass, Esquire
Law Offices of Burnham & Douglass
8000 Sagemore Drive
Suite 8303
Marlton, NJ  08053

Re:  EEOC Charge Against Cape May County Prosecutor's Office
     No. 530202000691

Dear Ms. Gannon:

   Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

   If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

   The investigative file pertaining to your case is located in the EEOC Philadelphia District Office, Philadelphia, PA.

   This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                    Sincerely,


                    Kristen Clarke
                    Assistant Attorney General
                    Civil Rights Division

               by      /s/ Karen L. Ferguson
                    Karen L. Ferguson
                    Supervisory Civil Rights Analyst
                    Employment Litigation Section


cc: Philadelphia District Office, EEOC
   Cape May County Prosecutor's Office